IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

REGINALD HARRELL,                    )
AIS # 261808,                        )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  )         CIVIL ACTION NO.:
                                     )         1:20-CV-535-TFM-N
KAY IVEY, et al.,                    )
                                     )
        Defendants.                  )

## SPECIAL REPORT

COMES NOW the Defendant, Robert Rivers, by and through undersigned counsel, and files this Special Report in accordance with the Order of this Honorable Court.  (Doc. 14).

## PARTIES

1.      Plaintiff, Reginald Harrell ("Harrell"), is an inmate in the custody of the Alabama Department of Corrections ("ADOC"), who is incarcerated in the St. Clair Correctional Facility ("St. Clair") in Springville, Alabama.

2.      Defendant, Robert Rivers ("Rivers"), is employed with ADOC as a Basic Correctional Officer.

## PLAINTIFF'S ALLEGATIONS

According to Harrell, on or about December 20, 2019 at 9:50 p.m., Officer House approached his cell to perform a cell check. (Doc. 10 at 4)  As Off. House approached Harrell's cell, he could see that the plumbing system malfunctioned and

1

water was spilling onto the floor. *Id.*   Harrell told Off. House that he was feeling suicidal and that he needed to talk to someone because he was stressing very bad. *Id.* Officer House cuffed Harrell and took him to the infirmary for a body chart.  *Id.*

Upon arriving at the infirmary Officers Siler, Price, Rivers and Hudson assisted Harrell to a crisis cell. *Id.* Officer House suggested that Nurse Jones leave the area where Harrell was being placed so that they could beat him up without the nurse witnessing to the incident. *Id.* at 5. While restrained in handcuffs, Harrell states that he was beaten by all the Defendants with their billy sticks and radios. *Id.*  Harrell states that he sustained severe head injuries and a chipped tooth. *Id.*

Approximately two hours later, Officer Jones came and got Harrell out of the crisis cell and took pictures of his injuries and got another body chart. *Id.* According to Harrell, the incident was filmed by cameras in the area.  *Id.*

Harrell appears to be suing the Defendants in their official and individual capacities. *Id.*  The Plaintiff is demanding from each Defendant the sum of one million dollars in compensatory damages and two million dollars in punitive damages for unnecessary infliction of mental anguish and pain and suffering.  *Id.*

<u>**DEFENDANT'S EXHIBIT**</u>

1.   Exhibit A – Certified Institutional Records.

## STATEMENT OF FACTS

At the time of this incident, Rivers was considered a cadet in training and had not been to the academy. (Ex. A at 273) The following facts relate to the incident detailed in the Plaintiff's Complaint.

According to institutional records, on December 21, 2019 Officer House observed Harrell pushing water from his cell causing the tier to flood. (Ex. A at 2) As Officer House approached Harrell's cell, Harrell told Officer House that he was suicidal. *Id.*  House handcuffed Harrell to the rear and removed him from his cell. House notified Lt. Kidd of the incident. *Id.*

Officers House, Hudson and BCO Rivers escorted Harrell to the healthcare unit to be evaluated. *Id.*  Harrell began yelling and acting belligerent during his assessment.  *Id.* Nurse Long filled out a body chart for Harrell, noted that he had no injuries, and notified Carrie Fisher, a licensed mental health provider of the incident. *Id.* at 2 and 4.  Ms. Fisher placed Harrell on constant watch and assigned him to a crisis cell.  *Id.* at 2. Rivers believed that Harrell was intoxicated at the time. (Ex. A at 268.)

According to records, Officer Siler conducted a search of cell S1-3A and found no contraband. (Ex. A) Officers House, Hudson and BCO Rivers escorted Harrell from the healthcare unit to the S-side dorm. *Id.* When they arrived at his

3

crisis cell, Harrell was issued a safety tunic/blanket, but refused to remove his clothing when ordered to do so by Officer House. *Id.* Officers House and Hudson entered Harrell's cell to retrieve Harrell's clothing, but Harrell swung at Officer House. *Id.* Officers House, Siler, Hudson, Price and BCO Rivers fought with Harrell and eventually placed Harrell face down in the cell and handcuffed him to the rear. *Id.* Harrell relinquished his clothing, received a tunic/blanket, and was secured in cell S-3 without any further incident. *Id.*

Officers Colvin and Jones escorted Harrell from his new cell back to the health care unit for an examination. *Id.* Harrell was examined by Nurse Long again, but this time she noted that Harrell had a scratch on his left shoulder, a bruise under his left eye, abrasions on his left knee, and two lacerations on his head. *Id.*

**ARGUMENT**

## I.   Eleventh Amendment Immunity.

The Eleventh Amendment bars claims against a state, its agencies, or its employees in their official capacity, unless the state consents. Papasan v. Allain, 478 U.S. 265 (1986); Alabama v. Pugh, 438 U.S. 781, 782, 98 S.Ct. 3057 (1978) (citing Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347 (1974)); Ford Motor co. v. Department of Treasury, 323 U.S. 459, 65 S.Ct. 347 (1945); See also Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900 (1983); Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139 (1979); Brown v. East Central Health District,

4

752 F.2d 615 (11th Cir. 1985).  As a department of the State of Alabama, and without the consent of the State, the ADOC and its employees in their official capacity are immune from suit under allegations of constitutional violations.  This immunity may not be circumvented by naming state officials as Defendants.  Almond Hill School v. U.S., 768 F.2d 1039 (9th Cir. 1985).  "[T]he Supreme Court determined in Will v. Mich. Dept. of State Police, that state officials are not considered persons subject to suit for money damages under § 1983 when sued in their official capacity.  491 U.S. 58, 109 S. Ct. 2304 (1989).  Thus, any claims against the Defendant in his official capacity are barred by Eleventh Amendment immunity and should be dismissed.  See also Alden v. Maine, 527 U.S. 706, 119 S. Ct. 2240 (1999).

## II.   Qualified Immunity.

Rivers is likewise entitled to immunity in his individual capacity.  Public officials in their individual capacities are afforded the defense of qualified immunity as a protection from money damages claims.  "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In analyzing qualified immunity, the reviewing court must not only focus on the state of the law but what facts the Defendant knew at the time of his challenged conduct.  Anderson v. Creighton, 483 U.S. 635, 642 (1987) (tasking the

5

reviewing court with determining whether "a reasonable officer could have believed [his conduct] to be lawful, in light of clearly established law *and the information the [Defendant] officers possessed*.") (emphasis added).   The shield of qualified immunity is indeed far-reaching:  "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  In fact, the Eleventh Circuit has observed that "[q]ualified immunity thus represents the rule, rather than the exception."  Sanders v. Howze, 177 F.3d 1245, 1249 (11th Cir. 1999).

The principles described above remain viable even in light of the United States Supreme Court's holding in Hope v. Pelzer, 122 S. Ct. 2508 (2002).  The Eleventh Circuit explained that this Circuit had always allowed room for the denial of qualified immunity in cases where general principles applied with "obvious clarity." Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003).  Because that is rarely the case, however, the court will normally require case law arising out of a factually similar context before it concludes the public official had sufficient notice or fair warning.  In other words, "[t]he Supreme Court decision in Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002), did not change the preexisting law of the Eleventh Circuit much."  Willingham, 321 F.3d at 1300.

While some Plaintiffs may feel that the qualified immunity doctrine gives public official defendants an unfair advantage, the United States Supreme Court has

6

found sound policy reasons to endorse qualified immunity:  without it, public officials not only faced the prospect of financial loss through an adverse verdict, the litigation process itself distracted them from their governmental duties, inhibited their discretionary actions – forcing them to "err always on the side of caution," and it deterred able people from public service.  Harlow, 457 U.S. at 816.

In order to establish that Rivers was acting within his "discretionary capacity," a public official asserting qualified immunity need only show "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988) (quoting Barker v. Norman, 651 F.2d 1107, 1121 (5th Cir.1981)).  Courts should not be "overly narrow" in interpreting this requirement.  Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994). Rivers easily clears the "low hurdle" of demonstrating that any dealings he had with Harrell was within his discretionary authority.  Indeed, the only allegations made against Rivers is that he was doing what correctional officials do, supervising and controlling inmates.  Of course, Harrell may allege that Rivers carried these duties out negligently, incompetently, or even unconstitutionally, but they are still duties normally associated with what correctional officials do—that is the standard for the finding of discretionary authority.

The burden then shifts *to the Plaintiff* to show that the Defendant official has

7

violated a clearly established right, and that the law was clearly established. Travers v. Jones, 323 F.3d 1294, 1295 (11th Cir. 2003) ("Once the defendants established that they were acting within their discretionary authority, a point not in dispute here, the burden shifted to the plaintiff to show that qualified immunity is inappropriate."). Once an official has asserted the defense of qualified immunity and shown that he was acting within his discretionary capacity, as the Defendant has here, the threshold inquiry a court must undertake is whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)). In other words, do the facts show that the Defendant's conduct violated the Plaintiff's constitutional rights? The first aspect of qualified immunity—determining whether the Plaintiff has stated a constitutional claim—while conceptually distinct from consideration of the Plaintiff's claims on the "merits" is, for all practical purposes, not much different from determining whether the Plaintiff has created a genuine issue of material fact on the merits. In other words, if the Court determines that the Plaintiff has failed to create a genuine issue of fact as to whether the Defendant's actions constituted excessive force, then it necessarily also concludes that the Plaintiff has failed to state a constitutional claim, and this Defendant should be granted qualified immunity without further inquiry.

8

## III.    Excessive Force.

Harrell cannot establish his burden to overcome qualified immunity because he cannot establish that alleged force used by the Rivers on December 20, 2019, was maliciously or sadistically applied for the purpose to cause harm, or for any other reason but to maintain and restore discipline.   The standard used in analyzing excessive force claims arising out of a prison context is based on the Eighth Amendment.   The law is very clear on the point that prison officials are afforded wide latitude in dealing with inmate disciplinary problems.   In Hudson v. McMillian, the United States Supreme Court reasoned:

> [C]orrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmate. . . .   Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

503 U.S. 1, 6 (1992) (citations omitted).

> The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense.

Whitley, 475 U.S. at 319 (1986).

> In evaluating the challenged conduct of jail officials, a court must keep in mind the paramount concerns of maintaining order and discipline in an often dangerous and unruly environment . . . .. *Prison administrators . . . should be accorded wide-ranging deference in the adoption and*

9

> *execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security . . .* That deference extends to prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline.

Id. at 319 & 321-322.; Williams v. Burton, 943 F.2d 1572, 1576 (11th Cir. 1991) ("[T]he courts give great deference to the actions of prison officials in applying prophylactic or preventive measures intended to reduce the incidence of riots and other breaches of prison discipline."); Ort v. White, 813 F.2d 318, 322 (11th Cir. 1987). "When the 'ever-present potential for violent confrontation and conflagration,' . . . ripens into actual unrest and conflict, the admonition that *'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators,'* . . . carries special weight." Whitley, 475 U.S. at 321 (emphasis in original). In Whitley, the Court held that the "shooting [of an inmate in the leg] was part and parcel of a good-faith effort to restore prison security . . . [and] did not violate respondent's Eighth Amendment right to be free from cruel and unusual punishments." 475 U.S. at 319.

An excessive force claim carries with it a different (and higher) standard than deliberate indifference clams under the Eighth Amendment. As explained in Flowers v. Bennett:

> Supreme Court precedent does, however, provide a different standard for Eighth Amendment/Fourteenth Amendment mistreatment claims depending upon the factual context of the claim. For example, claims

10

of prisoner/pretrial detainee mistreatment are analyzed under the deliberate indifference standard when they involve the alleged denial of medical care or the alleged failure to respond to a serious risk to inmate health and safety. *A higher standard with a more culpable intent requirement is applied when the claim involves allegations of the use of excessive force.*

135 F. Supp. 2d 1150, 1155, n.6 (N.D. Ala. 2000) (emphasis added) (internal citations omitted). See Hudson, 503 U.S. at 8 ("What is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause depends upon the claim at issue.").

In determining whether an excessive force violation has occurred, the proper inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21; Bozeman v. Orum, 422 F.3d 125 (11th Cir. 2005). Thus, in order to prevail on an excessive-force claim, a plaintiff must demonstrate that those who used force against him acted with malicious purpose. In addition, a plaintiff must prove that a requisite amount of force was used against him. Hudson v. McMillian, 503 US 1, 9-10, 112 S.Ct. 995, 1000 (1992)." Connell v. Tate, 2012 WL 252817, 12 (M.D. Fla. 2012). "Under the [Whitley] standard, a prison security measure undertaken to resolve a disturbance gives rise to a §1983 claim *only if* the measure taken 'inflicted unnecessary and wanton pain and suffering' upon the prisoner . . .. Moreover, the analysis must be informed by the wide ranging deference which is to be accorded prison administrators acting to preserve discipline and

11

intuitional security.  Thus, a prisoner may avoid . . . summary judgment, as in this case, *only if* the evidence viewed in the light most favorable to him *goes beyond a mere dispute over reasonableness of the force used and will support a <u>reliable inference of wantonness in infliction of pain.</u>*" <u>Brown v. Smith</u>, 813 F.2d 1187,1188 (11th Cir. 1987) (internal citations omitted)(emphasis added).  "Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support at reliable inference of wantonness in the infliction of pain … the case should not go to the jury."  <u>Stanfil v. Talton</u>, 851 F.Supp.2d 1346, 1371 (M.D. Ga. 2012)(citing <u>Whitley</u>, 475 U.S. at 322).

The Court in <u>Whitley</u> established factors to consider in evaluating whether the use of force was wanton and unnecessary.  These factors include: 1) the need for application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the prison official; 4) any efforts made to temper the severity of a forceful response; and 5) the extent of the injury suffered by the inmate.  475 U.S. at 1085.

In Harrell's case, the force applied by Rivers during the incident was the use of strikes to his chest area and a take down after he swung at Officer House.  Harrell was given repeated opportunities to calm down and come into compliance.  (Ex. A at 294).

In applying the five <u>Whitley</u> factors to that incident as the records reflect, it is

12

evident that no constitutional violation occurred.  (1) There was certainly a need for the application of force used and for discipline to be restored after Harrell swung at Officer House.

(1)  Discipline needed to be restored, and because Harrell attempted to hit Officer House, the other officers were in a position of uncertainty as to their safety, Harrell needed to be restrained.  The use of force was justified.  Rivers used a reasonable amount of force to control the situation and achieve a legitimate correctional objective.  (Ex. A at 294 - 295).

(2)  The amount of force was certainly comparable to the need.  *De minimis* uses of force cannot support a claim for a constitutional violation "provided that the use of force is not of a sort repugnant to the consciences of mankind."  Hudson, 503 U.S. at 9-10 (internal quotation marks omitted).  See Johnson, 206 Fed. Appx. at 885 (reasoning that even deliberate and unnecessary uses of force in "a relatively minor amount" are not repugnant to the "conscience of mankind" and therefore does not violate the Eighth Amendment).  In this instance, Rivers used just enough force to restrain Harrell.  Once Harrell was secured, all force ceased.  (Ex. A at 292).  Such a minor amount of force certainly is not repugnant to the conscience.  Harrell was evaluated by medical staff immediately following the incident.  (Ex. A at 310).

(3) The threat perceived by Rivers was reasonable, as was the minimal amount of force used to curb any such threat.  Rivers believed that Harrell was "high" and

13

Harrell had made threats just before the incident occurred. (Ex. A at 273, 282)

(4) Absent turning a blind eye to violations of institutional rules and the uncertainty of what Harrell would do next, there is nothing that Defendants could have done to temper the need to restrain Harrell. Harrell made threats just before the incident and he was in the process of carrying out those threats when he swung at Officer House. (Ex. A at 282 – 283)

(5) The body chart taken immediately after the incident noted no major injuries at all, much less an injury or distress reflective of Harrell's allegations that he was punched, kicked, stomped, and repeatedly struck with a baton. Harrell was taken to the infirmary where he was treated for a scratch on his left shoulder, a bruise under his left eye, abrasions on his left knee, and two lacerations on his head. One laceration was one (1) centimeter long and the other measured just two (2) centimeters. (Ex. A at 360)

In reviewing Whitley's five factors as a whole as it relates to the December 21, 2019 incident, the evidence shows that Harrell presented the need to use the *di minimus* force of restraining him so he could be brought into compliance. This Court should conclude that Rivers' actions were not precipitated by the intent to cause pain to the Plaintiff, but rather to restore the discipline that was lost when Harrell swung at Officer House.

## CONCLUSION

Based upon the foregoing, the Defendant requests this Honorable Court DISMISS this action, or treat this Special Report as a motion for summary judgment, and GRANT said motion in favor of the Defendant.

Respectfully submitted,

STEVE MARSHALL
ATTORNEY GENERAL

 /s/ J. MATT BLEDSOE
J. MATT BLEDSOE (BLE006)
Assistant Attorney General
Counsel for Defendant
Rivers

**OF COUNSEL:**

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130
334-242-7443
Matt.Bledsoe@AlabamaAG.gov

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 18th day of February, 2022, filed the foregoing with the Clerk of the Court, using the ECF filing system, which will notify the following counsel of record: H. William Wasden, Michael D. Strasavich, Lisa Darnley Cooper, and Christine Elizabeth H. Hart.  I have further served a copy of the foregoing upon the following parties, by placing same in the United States Mail, postage prepaid and properly addressed as follows:

Reginald Harrell, AIS # 261808
St. Clair Correctional Facility
1000 St Clair Road
Springville, AL 35146

/s/ J. MATT BLEDSOE
OF COUNSEL

16