IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| REGINALD HARRELL, | ) |
| AIS # 261808 | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 1:20-00535-TFM-N |
| | ) |
| OFFICER HOUSE, *et al.*, | ) |
|     Defendants. | ) |

## REPORT AND RECOMMENDATIONS

This civil action is before the Court on motions for summary judgment under Federal Rule of Civil Procedure 56 filed by Defendants Darious House, LaBryson Hudson, Marquino Siler, LeVante Price and Robert Rivers. (*See* Docs. 53, 54, 57, 58, 64).[1] Plaintiff Reginald Harrell ("Harrell") – who is proceeding without *pro se* and *in forma pauperis* ("IFP") – has filed a response, along with an affidavit in support. (Docs. 73, 74). Defendants Price and Silver have also filed a reply. (Doc. 76). Upon consideration, and for the reasons stated herein, the undersigned **RECOMMENDS** the motions for summary judgment be **GRANTED**.

### I.  *Procedural History*

Plaintiff initiated this civil action under 42 U.S.C. § 1983 by filing a complaint on November 2, 2020,[2] along with a contemporaneous IFP motion. (Docs. 1, 2).

---

[1] The District Judge assigned to this case referred all pretrial matters to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R) for appropriate resolution. (*See* Doc. 40; 12/9/2021 electronic reference).

[2] "Under the prison mailbox rule, a pro se prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Jeffries v. United States*, 748 F.3d 1310, 1314 (11th Cir. 2014) (citation omitted). Plaintiff's complaint certifies placement with prison officials for mailing on November 2, 2020. (Doc. 1, PageID.7).

Following review of the complaint and IFP motion, IFP status was granted November 12, 2020. (Doc. 3). Upon receipt of a partial filing fee (Docs. 4, 5), the Court entered an order on March 12, 2021, directing that Defendants be served. (Doc. 6). This order instructed Defendants to file answers and special reports and ordered Plaintiff to clarify certain aspects of his complaint. (*See id*.). Plaintiff timely responded, filing the operative amended complaint[3] on April 21, 2022. (Doc. 10).

After a series of procedural steps and extensions, Defendants' answers and special reports were filed between February 18-28, 2022. (Docs. 53, 54, 57, 58). In an order dated May 2, 2022, these filings were converted into motions for summary judgment under Federal Rule of Civil Procedure 56. (Doc. 64). Plaintiff filed an unsworn response in opposition with an unsworn supporting affidavit to the motions for summary judgment on November 8, 2022. (Docs. 73, 74).[4] Defendants Price and Siler filed a timely reply on November 30, 2022. (Doc. 76). The motions for summary judgment are now under submission and ripe for disposition.

---

3 Plaintiff's amended complaint (Doc. 10) does not satisfy the requirements of 28 U.S.C. § 1746 because it is not dated. *See Roy v. Ivy*, 53 F.4th 1338, 1349 n.7 (11th Cir. 2022) (inmate statement does not satisfy § 1746 if undated). However, Harrell's original complaint (Doc. 1) does satisfy the criteria of § 1746, and its contents are substantively identical and nearly verbatim to language of the amended complaint. *Compare* Doc. 1, PageID.4-9 *with* Doc. 10, PageID.36-38. Thus, the undersigned opts to construe the sworn allegations in Plaintiff's original complaint (as reiterated by his amended complaint) as an affidavit opposing summary judgment, and the Court will credit the "specific facts" alleged and sworn to therein when considering Plaintiff's opposition to summary judgment. *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (explaining that when a plaintiff alleges specific facts in a sworn complaint, they must be considered in their sworn form). When referencing these facts, the undersigned will cite to both the original and amended complaints but will collectively refer to those facts as being asserted in "Plaintiff's complaint."

4 Both Plaintiff's opposition response and supporting affidavit (Docs. 73, 74) fail to satisfy the requirements of 28 U.S.C. § 1746 because they lack "penalty of perjury" language. *See Roy*, 53 F.4th at 1348 (stating requirements for unsworn statement to substitute as a sworn affidavit under § 1746).

## II.    *Factual Background*

Plaintiff's complaint asserts an excessive force claim pursuant to the Eighth Amendment against each named Defendant arising out of events transpiring on December 21, 2019. (*See* Docs. 1, 10). At all times relevant, Harrell was housed as an inmate at the Holman Correctional Facility ("Holman") in Atmore, Alabama, where each Defendant worked as a correctional officer ("CO")[5] for the Alabama Department of Corrections ("ADOC"). (Docs. 1, 10, 53, 54, 57, 58). However, Plaintiff's complaint is not a model of clarity, and the undersigned initially notes some confusion among the parties as to exactly what conduct is alleged against which Defendant.

In section III of his form § 1983 complaint, Harrell describes his claim against CO House as "use of unnecessary and excessive force/cruel and unusual punishment," and in the corresponding subsection entitled "supporting facts," Harrell states: "On or about 12-20-2019, at approximately 9:50 p.m., while being housed at the Holman Prison in the infirmary – see attached facts alleged in lawsuit." (Doc. 1, PageID.5; Doc. 10, PageID.39). Based on these statements, one would anticipate the referenced "attached facts" to detail a use of excessive force against him while in the infirmary or Health Care Unit ("HCU"). However, those facts – included in section II of the form § 1983 complaint – do not describe an incident in the HCU; rather, this section details an alleged use of excessive force by all named Defendants occurring inside the crisis cell block. (*See* Doc. 1, PageID.4-5, 8-9; Doc. 10, PageID.36-38).

[5] According to Defendant Rivers, "[a]t the time of this incident, Rivers was considered a cadet and had not been to the academy." (Doc. 54, PageID.129). Accordingly, he is referred to as "Cadet Rivers."

Further complicating matters is the undisputed video footage contained in the record, which depicts two different instances – fewer than five minutes apart – where at least some force was used by one or more Defendants. (Docs. 57-5, 57-6, 58-4, 58-5). The footage from the HCU (Docs. 57-5, 58-4) shows a commotion in the examination room where Harrell was located at approximately 10:05 p.m., and the footage from the crisis cell block depicts another incident occurring at approximately 10:09 p.m. inside the crisis cell. (Docs. 57-6, 58-4).

Defendants' varying interpretations of the complaint are apparent in their filings. For example, the joint answer and special report of Defendants House and Hudson focuses on the incident in the crisis cell, but notes and defends against any alleged use of force by these COs in the HCU. (Doc. 57). Compare this to the joint answer and special report of Defendants Price and Siler, who view the incident in the HCU as "the only use of force alleged," but goes on to address and defend against the incident in the crisis cell "out of an abundance of caution." (Doc. 58, PageID.545). Finally, the special report of Defendant Rivers only addresses and defends against the alleged use of force during the incident in the crisis cell. (Doc. 54).

Plaintiff's unsworn opposition response and affidavit (Docs. 73, 74) also add to the confusion. Both filings fail to satisfy the requirements of 28 U.S.C. § 1746 because they lack any "penalty of perjury" language. *See Roy*, 53 F.4th at 1348 (stating requirements for unsworn statement to substitute as a sworn affidavit under § 1746). Accordingly, the extent these filings assert new factual allegations for the first time, they cannot be credited as "specific facts" for purposes of Harrell's opposition to

summary judgment. *See id.* at 1349 (affirming District Court's decision to not consider unsworn inmate statements at the summary judgment stage and declining to afford them liberal construction).

Momentarily putting aside the unsworn nature of these filings (Docs. 73, 74), Plaintiff recharacterizes the allegations of his complaint in his opposition response as describing "basically two incidents that occurred at different times on December 21, 2019." (Doc. 73, PageID.637). According to Harrell, "[t]he first incident occurred … when Plaintiff was being escorted from the Restrictive Housing Unit to the infirmary" and happened "[r]ight before entering the HCU." (Doc. 73, PageID.637-39). The second incident described correlates to the allegations in his complaint of an alleged use of excessive force inside the crisis cell. (Doc. 73). However, Plaintiff adds new allegations against COs House, Hudson, Siler and Cadet Rivers on the way from the HCU to the crisis cell. (Doc. 73, PageID.639-40). Plaintiff's unsworn affidavit similarly recharacterizes the allegations of his complaint, describing first an alleged incident before arriving at the HCU where "the Defendants just started assaulting the Plaintiff without justification." (Doc. 74, PageID.647). And in describing the second incident, Harrell states: "Defendants after assaulting Plaintiff took him to the HCU and then to [the crisis cell] only to assault the Plaintiff again…" (*Id.*).

Read collectively, Plaintiff's filings allege three potential instances of excessive force: (1) before entering the HCU, (2) on the way from the HCU to the crisis cell block, and (3) in the crisis cell. (Docs. 1, 10, 73, 74). Notably, this list does not include an allegation of excessive force used against Harrell inside the HCU, despite the video

evidence depicting a commotion inside the examination room (Docs. 57-5, 58-4), and each Defendant addressing this incident to some extent in their respective answers and/or special reports. (*See* Docs. 54, 57, 57-3, 57-4, 58, 58-2, 58-3).

Accordingly, because Plaintiff has not asserted a claim of excessive force used against him while inside the HCU, it will not be addressed. Moreover, the newly asserted allegations of excessive force before entering the HCU and on the way from the HCU to the crisis cell cannot be credited as specific facts for purposes of summary judgment because those filings are unsworn.[6] *Accord. Roy*, 53 F.4th at 1348. As such, these new allegations are also not addressed. This leaves only the incident in the crisis cell block to be discussed below.

### A. Plaintiff's Allegations

According to Plaintiff, on the evening of December 21, 2019, he began to experience mental health concerns while in his cell. (Docs. 1, 10). Harrell states he was "stressing very bad," feeling suicidal and needing to speak with someone. (Doc. 1, PageID.4-5; Doc. 10, PageID.36). Around this same time, CO House – who was conducting a cell check – noticed water spilling onto the floor from Harrell's cell. (Docs. 1, 10). CO House went to investigate, and Harrell explained to him that he

---

[6] Even if credited, Harrell's new claim of an assault "right before entering the HCU" is not supported by the record. (Doc. 73, PageID.639). Harrell states he "suffered bruises to my head, back, face, eyes, shoulders and legs" as a result of this assault and points the Court to body chart form "HCF-19-01307. Dated 12/21/19" for support. (Doc. 73, PageID.639). The record contains two different body chart forms labeled HCF-19-01307, both authored by Nurse Arthur Long. *Compare* Doc. 58-1, PageID.573 *and* Doc. 58-1, PageID.574. The form first in time is filled out at 10:00 p.m., (Doc. 58-1, PageID.574), less than two minutes after a seemingly uninjured Harrell enters the HCU. (Docs. 57-5, 58-4). Therefore, if Harrell had been assaulted "right before entering the HCU," (Doc. 73, PageID.639), his injuries would have been fresh and apparent during the body chart conducted at 10:00 p.m. However, this body chart notes no observable injury. (Doc. 58-1, PageID.574).

needed mental health care. (*Id*.). CO House then placed Harrell in handcuffs, and took him to the HCU. (*Id*.). Harrell's complaint does not detail any events between his transfer from his cell to the HCU, but states "upon arriving at the infirmary, Officer [Siler], Price, Rivers and Hudson made an attempt to assist me with Nurse Jones [and] have me placed in a crisis cell after the body chart was done." (Doc. 1, PageID.5; Doc. 10, PageID.36). Harrell's explains a crisis cell "is the equivalent to a padded cell for people of suicidal tendencies." (Docs. 1, 10).

Harrell's complaint does not describe events between his departure from the HCU and subsequent arrival at the crisis cell block. However, upon arrival at the crisis cell block, Harrell avers that CO House "suggested that Nurse Jones leave the area to where I was being placed so they could beat me up without her being a witness to the incident." (Doc. 1, PageID.8; Doc. 10, PageID.37). Harrell then asserts, "[w]hile still being restrained in handcuffs, I was beaten by all the defendants named in this lawsuit." (*Id*.). Harrell adds that Defendants used billy sticks and radios to carry out the alleged assault and explains he sustained "severe head injuries [and] a chipped tooth" as a result. (*Id*.). Approximately two hours later, Harrell states Nurse Jones took him back to the HCU for a second body chart, and pictures were taken of his injuries. (*Id*.). Harrell notes the entire incident was filmed by security cameras. (*Id*.).

Harrell's complaint concludes by asserting all Defendants were ADOC officers on duty at the time of his allegations and clarifies his claims are brought against each Defendant in his individual capacity. (Docs. 1, 10). For relief, he seeks $1 Million in compensatory damages and $2 Million in punitive damages from each Defendant for

the alleged violation of his Eighth Amendment rights to be free from cruel and unusual punishment, excessive force and wanton and/or "unnecessary infliction of mental anguish, pain and suffering." (Doc. 1, PageID.9; Doc. 10, PageID.37). Plaintiff closes by summarizing, "[t]his lawsuit is brought on because each Defendant knew that they [were] acting in total disregards of the law when beating this Plaintiff while in restraints." (Doc. 1, PageID.9; Doc. 10, PageID.38).

## B. Defendants' Answers and Special Reports

Summarized in this section are: (1) the jointly filed answer and special report of Defendants House and Hudson (Docs. 57, 57-1 through 57-6), (2) the jointly filed answer and special report of Defendants Siler and Price (Docs. 58, 58-1 through 58-6), and (3) the answer and special report of Defendant Rivers (Docs. 53, 54, 54-1). Each answer and special report include various attachments and exhibits, relevant portions of which are noted in the discussion below.

### 1. *Defendants House and Hudson*

Both Defendants House and Hudson deny the allegations made by Harrell and assert available immunity defenses. (Doc. 57, PageID.513-14). While these Defendants admit to using "minimal, justified, and necessary force," both deny using excessive force or otherwise violating Harrell's rights. (*Id*.). Their joint filing includes an inmate summary, duty officer reports, sworn declarations by both Defendants and video footage from the HCU and crisis cell block. (*See* Docs. 57, 57-1 through 57-6).

According to their sworn declarations, both COs House and Hudson worked the 2 p.m. to 10 p.m. shift at Holman on December 21, 2019. (*See* Docs. 57-3, 57-4).

Toward the end of this shift, at approximately 9:50 p.m., they noticed water flowing onto the floor from Harrell's cell. (Doc. 57-3, PageID.536; Doc. 57-4, PageID.539). They went to investigate, and Harrell told the COs he was feeling suicidal and was under the influence of an unspecified drug, which he had allegedly snorted. (*Id.*). The two determined Harrell should be taken to the HCU, so he was placed in handcuffs and escorted there. (*Id.*). Along the way, they were joined by CO Siler and Cadet Rivers. (Doc. 57-3, PageID.536; Doc. 57-4, PageID.539-40).

At approximately 9:58 p.m., the group of Defendants House, Hudson, Siler and Rivers are seen entering the HCU with Harrell. (*See* Doc. 58-4).[7] Now in the HCU, Harrell was escorted to an examination room for evaluation. (Doc. 57-3, PageID.536; Doc. 57-4, PageID.40). Both COs House and Hudson attest that during this time, Harrell became uncooperative, belligerent and even threatening. (*Id.*). CO House asserts Harrell threatened "y'all gone have to do y'all job." (Doc. 57-3, PageID.536). CO Hudson asserts Harrell made similar comments, and that "[d]uring the entire time, Harrell was saying things that really didn't make any sense, like 'we were trying to kill him' and the inmates in Seg (the restrictive housing area) were trying to kill him." (Doc. 57-4, PageID.540).

During this evaluation, Harrell allegedly stated a desire to hurt himself, so the decision was made to place him in a crisis cell. (Doc. 57-2, PageID.534). At the close of the evaluation, both COs House and Hudson aver Harrell escalated his disruptive

---

7 Video footage included in the answer and special report of COs House and Hudson does not show the group entering the HCU. (Doc. 57-5). However, the footage included in the answer and special report of COs Price and Siler shows timestamped footage of the group entering at 9:58 p.m. (Doc. 58-4).

and disobedient behaviors, at one point standing from the exam table and making a movement toward the nurse's station. (Doc. 57-3, PageID.536; Doc. 57-4, PageID.540). When Harrell made this move, CO House states he grabbed him by the handcuffs, and Harrell fell into COs House and Hudson. (Doc. 57-3, PageID.537). Though a commotion ensued,[8] both COs attest they quickly regained control of Harrell, and assert the only force used at this time was the minimal amount necessary to restrain him. (Doc. 57-3, PageID.537; Doc. 57-4, PageID.540).

Now compliant, the group of COs escorted Harrell to the crisis cell block. (*Id*.). CO Hudson states the group was comprised of himself, along with CO House and Cadet Rivers, plus COs Price and Siler – who were there "to provide additional backup" due to Harrell's threatening comments, alleged intoxication and apparent size advantage. (*See* Doc. 57-4, PageID.540). The group arrived at the crisis cell block at approximately 10:07 p.m., and Harrell was taken directly to the cell. (*See* Doc. 57-6). Once inside the cell, Harrell's handcuffs were removed, and he was ordered to remove his clothing so that he could be placed in a safety tunic – a required protocol for Holman inmates under watch in crisis cells. (Doc. 57, PageID.516).

Harrell allegedly refused this direct order to disrobe, so the COs stepped into the cell to remove Harrell's clothes for him. (Doc. 57-3, PageID.537; Doc. 57-4, PageID.540). At this point, Harrell allegedly took at least one closed-fist swing at CO House, "narrowly missing his jaw," according to CO Hudson. (*Id*.). In response, the

---

8 The video footage from the HCU included with the answer and special report of COs House and Hudson includes footage depicting a commotion in the examination room at approximately 10:05 p.m., though the camera angle does not provide a clear view inside this examination room. (*See* Doc. 57-5).

other COs stepped into the cell to assist. (*See* Doc. 57-6). Both COs House and Hudson admit to using some force to subdue Harrell, but attest that the altercation was brief, and no more force was used than necessary to restrain him. (Doc. 57-3, PageID.537; Doc. 57-4, PageID.540). Moreover, both assert no CO used a radio or billy stick as a weapon. (*Id.*). Once restrained, Harrell's clothing was removed, the COs exited the cell, and Harrell was given with a safety tunic and blanket. (*Id.*).

Both COs close their sworn declarations by noting August 2020 criminal charges stemming from this incident; however, both COs explain these charges were subsequently dropped. (*Id.*).

### 2. *Defendants Price and Siler*[9]

Both Defendants Siler and Price deny the allegations made against them and assert available immunity defenses. (Doc. 58, PageID.545-56). These two Defendants admit that while they "assisted other officers to restore order and obtain Plaintiff's compliance in the safe cell … the force used in response did not come close to being unconstitutionally excessive." (Doc. 58, PageID.547). Their joint filing also includes institutional records, sworn affidavits, HCU body charts, photos of Plaintiff's injuries and video footage from the HCU and crisis cell block. (Docs. 58, 58-1 through 58-5).

According to their sworn affidavits, COs Price and Siler were slated to work the 10 p.m. to 6 a.m. shift on the day in question. (Docs. 58-2, 58-3). Both arrived

---

9 As previously noted, the joint answer and special report of Defendants Price and Siler largely focuses the commotion inside the HCU, rather than events in the crisis cell block. Thus, these Defendants' statement that "[b]ecause Harrell does not allege that excessive force was used in the isolation cell, there is no such claim before the Court," is in err. (Doc. 58, PageID.557). However, these Defendants assert an "even if" line of argument based on the events taking place in the crisis cell, which the Court will take into account. (*See* Doc. 58, PageID.557-59).

prior to the start of their shift and responded to a call for assistance with Harrell. (*Id.*). CO Siler joined COs House and Hudson in escorting Harrell to the HCU, and CO Price joined them in the HCU shortly thereafter. (*Id.*). Both COs Price and Siler attest to being informed that Harrell was moved to the HCU because he was suicidal and/or under the influence of drugs. (Doc. 58-2, PageID.584; Doc. 58-3, PageID.589).

Now in the HCU, CO Price states he "heard Harrell and the officers verbally going back and forth," and specifies, "Harrell was 'running his mouth' and was being belligerent, hostile, and using aggressive language … [telling] the COs he was going to make them 'do their job.'" (Doc. 58-2, PageID.584). Though CO Price was not in the examination room at the time, he "heard a commotion," walked over and saw Harrell "rushing and pushing forward while the COs were trying to restrain him and put him back in his seat." (*Id.*). CO Price states no CO struck Harrell at this time, and explains the only force used was minimal and to subdue Harrell. (*Id.*).

CO Siler was not present for the commotion in the HCU, as he had left to conduct a check of the crisis cell where Harrell was to be taken. (Doc. 58-3, PageID.589). However, he rejoined Harrell and the other Defendants while they were en route to the crisis cell block. (*Id.*). While in transit, CO Siler asserts that Harrell remained defiant. (Doc. 58-3, PageID.590). CO Price similarly provides that "Harrell stated numerous times that he was not going to cooperate or give up his property (i.e., his clothes) to us in the safe cell." (Doc. 58-2, PageID.584).

Once Harrell was placed in the crisis cell, both COs Price and Siler state he refused to disrobe, despite direct orders from the COs to do so. (Doc. 58-2, PageID.585;

12

Doc. 58-3, PageID.590). CO Siler then removed Harrell's handcuffs, and he was ordered to disrobe again. (*Id*.). Refusing to comply yet again, the COs began to enter the cell. (*Id*.). According to CO Siler, "[a]s I was standing and observing in the hallway, Harrell swung at Officer House with a closed fist." (Doc. 58-3, PageID.590). COs Price and Siler then moved in to assist. (Doc. 58-2, PageID.585; Doc. 58-3, PageID.590). CO Price did not see Harrell swing at CO House, attributing his lack of perspective to the close quarters of the cell, but notes "House quickly moved backward in the safe cell as if he were being assaulted." (Doc. 58-2, PageID.585).

Both COs Price and Siler assert Harrell resisted for a short time, but that once Harrell stopped resisting, the use of force by all Defendants ceased. (Doc. 58-2, PageID.585; Doc. 58-3, PageID.590). Moreover, both assert no officer used a weapon during the incident. (*Id*.). COs Price and Siler also close by noting August 2020 charges against them which were later dropped. (Doc. 58-2, PageID.585; Doc. 58-3, PageID.590-91). CO Siler adds he took photos of Harrell in the HCU later that night, and that Harrell continued making threats at this time. (Doc. 58-3, PageID.591).

### 3. *Defendant Rivers*

In his answer, Defendant Rivers denies allegations made against him and asserts available immunity defenses. (Doc. 53, PageID.124-26). To support his position, Cadet Rivers includes a 363-page attachment of certified institutional records. (*See* Doc. 54-1). These records largely relate to the investigation and charges alluded to by COs House, Hudson, Price and Siler. (*See* Docs. 57-3, 57-4, 58-2, 58-3). Among the records are: (1) ADOC incident report forms, (2) a summary investigative

report authored by ADOC investigator Bryan Davis, (3) transcripts of interviews conducted during that investigation and (4) the general liability release statements signed by Defendants after their arrest(s) and the subsequent dismissal of charges against them. (*See generally*, Doc. 54-1). The answer and special report of Cadet Rivers does not include an affidavit or any sworn recitation of his version of events. Rather, he appears to rest on the assertion that he did not violate Harrell's constitutional rights by using force against him, and even if he did, he should be entitled to qualified immunity and/or Eleventh Amendment sovereign immunity.

### III.    *Legal Standard*

Summary judgment is appropriate and shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."), *and Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (per curiam) ("[S]ummary judgment is appropriate even if some alleged factual disputes between the parties remains, so long as there is no genuine issue of material fact." (citation and internal quotation omitted)). A fact is "'material' if it might affect the outcome of the suit under governing law and it is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (citation omitted).

In reviewing a motion for summary judgment, the Court views the facts in the light most favorable to the non-movant, drawing "all justifiable inferences in [its] favor." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation and internal quotation omitted). However, the Court should "avoid weighing conflicting evidence or making credibility determinations." *See Ave CLO Fund*, 723 F.3d at 1294 (citations omitted) (noting "an inference based on speculation and conjecture is not reasonable.").

The summary judgment movant bears the initial burden of establishing the basis for the motion, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and can meet this burden by either: (1) "show[ing] that the non-moving party has no evidence to support its case," or (2) "present[ing] affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *See Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (citation and internal quotations omitted). If a movant carries this initial burden, "the burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment – only factual disputes that are material preclude entry of summary judgment. *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004). A non-movant must point to more than a "mere scintilla" of evidence to overcome a summary judgment motion – and rather, "must produce substantial evidence in order to defeat a motion

for summary judgment," *Garczynski*, 573 F.3d at 1165 (11th Cir. 2009) (citation omitted). *See id.* ("A genuine dispute requires more than 'some metaphysical doubt as to material facts.'") (citation omitted)). *See also, Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."). Stated differently, "there must be enough of a showing that the jury could reasonably find for that party … [w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotations omitted).

## IV.   *Analysis*

Harrell's complaint proceeds pursuant to 42 U.S.C. § 1983. (*See* Docs. 1, 10). "To establish a claim under 42 U.S.C. § 1983, a plaintiff must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under color of state law." *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005) (citation omitted). In the present case, Defendants do not dispute they were acting under color state law. Each Defendant was employed by and working for ADOC, and thus, they are considered state actors for purposes of this action. *See Faulkner v. Dunn*, 2019 U.S. Dist. LEXIS 194837, *23 (S.D. Ala. 2019) ("There is no dispute that the named defendants, as employees of [ADOC] … are state actors for purposes of this action."). Moreover, Plaintiff's complaint asserts his claims against each Defendant in their individual capacities. (Docs. 1, 10).

16

Each Defendant denies the allegations made against him and assert various immunity defenses, including qualified immunity. (*See* Docs. 53, 57, 58).

> Under the doctrine of qualified immunity, if the defendant establishes that he was acting within the scope of his discretionary authority when the alleged excessive force occurred, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. *Skop* [*v. City of Atlanta, 485 F.3d 1130, 1136-37 (11th Cir. 2007)].* To defeat qualified immunity, a plaintiff must show both that a constitutional violation occurred and that the constitutional right violated was clearly established. *Fennell* [*v. Gilstrap*, 559 F.3d 1212, 1216 (11th Cir. 2009) (per curiam)]. In Eighth Amendment excessive force cases, however, "the subjective element required to establish [the constitutional violation] is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution." *Johnson v. Breeden*, 280 F.3d 1308, 1321-22 (11th Cir. 2002) … "While…there is no per se rule barring qualified immunity in Eighth Amendment cases, where the plaintiff has sufficiently alleged or shown a material dispute of fact as to an excessive force claim, summary judgment based on qualified immunity is not appropriate. *See Skrtich* [*v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002)].

*Bowden v. Stokely*, 576 F. App'x 951, 954-55 (11th Cir. 2014) (per curiam).

There is no dispute Defendants were acting within the scope of their discretionary authority at the time of the incident in the crisis cell. Plaintiff even asserts Defendants were on duty "to employ security throughout the Holman prison unit" at the time of the incident. (Doc 1, PageID.8; Doc. 10, PageID.37). *See Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (explaining "a government official proves that he acted within his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.'" (citations omitted)). Thus, to overcome an assertion of qualified immunity, the burden

shifts to the Plaintiff to show: (1) that the officers' conduct violated a constitutionally protected right, and (2) that this right was clearly established at the time. *Bowden*, 576 F. App'x at 954.

Among other things, the Eighth Amendment prohibits cruel and unusual punishment against prisoners, and "the unnecessary and wanton infliction of pain" qualifies as such. *Sconiers v. Lockhart*, 946 F.3d 1256, 1265 (11th Cir. 2020) (citing *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). The two-pronged standard established for Eighth Amendment excessive force claims "requires a prisoner to establish two elements-one subjective and one objective: the official must have both 'acted with a sufficiently culpable state of mind' (the subjective element), and the conduct must have been 'objectively harmful enough to establish a constitutional violation.'" *Sconiers*, 946 F.3d at 1265 (citation omitted). However, the "core judicial inquiry" of an Eighth Amendment excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)).

The undersigned will address the subjective element first. Under this prong, "to have a valid claim on the merits of excessive force in violation of [the Eighth Amendment], the excessive force must have been sadistically and maliciously applied for the very purpose of causing harm." *Sconiers*, 946 F.3d at 1265 (citation omitted). In evaluating this core judicial inquiry, Courts are instructed to consider five non-exhaustive factors: (1) the need for the use of force, (2) the relationship between the need for force and amount of force used, (3) the extent of any injuries, (4) the extent

of threats posed so staff and inmates as perceived by a reasonable officer on the scene, and (5) any efforts taken to temper the severity of a forceful response. *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) (citations omitted). In evaluating these factors, Courts "must also give a wide range of deference to prison officials acting to preserve discipline and security, including when considering [d]ecisions made at the scene of a disturbance.'" *Id*. (citation and internal quotation omitted).

## A. The Need for the Use of Force

First, the need for the use of force. Defendants offer two grounds to justify the need for the use of force: (1) Harrell's alleged attempt to strike CO House and (2) Harrell's refusal to follow orders. (Docs. 54, 57, 58). Both grounds may justify the need for at least some force to be used, because "[p]rison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008). Further, "the need for the use of force is established by the undisputed evidence that [the inmate] created the disturbance," *Bennett v. Parker*, 898 F.3d 1530, 1533 (11th Cir. 1990), and an inmate's failure to follow orders can constitute such a disturbance necessitating use of force. *See Danley*, 540 F.3d at 1307 ("[P]rison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out. Certainly they are not required to do so where an inmate repeatedly fails to follow those orders").

In his unsworn opposition response, Harrell generally denies that he disobeyed any direct order(s) or that he was the aggressor. (Doc. 73, PageID.640). Rather, he

states "[t]he Defendants make[] the assertion that the force used was justified because the Plaintiff allegedly attacked Defendant House. However, the Defendants references to the video does not help their case, because nowhere does it show the Plaintiff being aggressive." (*Id.*). Plaintiff is correct insofar as the video footage does not show him acting physically aggressive toward the COs in the crisis cell block. (Doc. 58-5). However, the camera's angle does not show the inside of the crisis cell where Harrell allegedly took the first swing at CO House.

The sworn statements by COs House, Hudson, Price and Siler each support the position that a need for the use of force arose when Harrell attempted to strike CO House. (Doc. 57-3, PageID.537; Doc. 57-4, PageID.540; Doc. 58-2, PageID.585; Doc. 58-3, PageID.590). Moreover, COs House, Hudson, Price and Siler uniformly assert Harrell refused to follow orders to disrobe, as required by Holman policy for inmates in crisis cells, and that Harrell's refusal is what necessitated Defendants entering the cell in the first place. (Docs. 54, 57, 57-3, 57-4, 58, 58-2, 58-3).

Harrell's generalized and unsworn denial of his role in this altercation is not sufficient to refute the contrary and uniformed testimonial statements made by Defendants that it was Harrell's attempt to strike CO House and/or disobedience of direct orders (*i.e.*, refusing to disrobe) that necessitated the use of force. Accordingly, this first factor weighs in favor of Defendants, especially when considering the deference afforded to them. *Cockrell*, 510 F.3d at 1311 (citation omitted).

**B. Relationship Between the Need for Force & Amount of Force Used**

Second, the relationship between the need for force and the amount of force used. The Supreme Court has held that "[t]he Eighth Amendment's prohibition of 'cruel and unusual punishment' necessarily excludes from constitutional recognition *de minimis* uses of force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9-10 (citation omitted). While the Court may consider the extent of any injury as an indication of the amount of force applied, the ultimate inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins*, 559 U.S. at 37.

Harrell's complaint generally asserts the amount of force used against him in the crisis cell was unnecessary and excessive, and specifically claims Defendants used billy sticks and radios to beat him "while still being restrained in handcuffs." (Doc. 1, PageID.5, 8-9; Doc. 10, PageID.37, 39). Plaintiff asserts he sustained "severe head injuries" and a chipped tooth as a result. (Doc. 1, PageID.8-9; Doc. 10, PageID.37). The record belies at least two key aspects of Plaintiff's claim. First, the undisputed video evidence establishes that Harrell was not handcuffed during the incident in the crisis cell, as CO Siler can be seen removing Harrell's handcuffs prior to any CO entering the cell and the altercation beginning. (Doc. 57-6, 58-4). Second, Plaintiff's characterization of his head injuries as "severe" is unsupported by the second body chart conducted by Nurse Long after the incident had occurred at 11:40 p.m. (*See* Doc. 58-1, PageID.573). This body chart reveals: (1) a scratch on the left shoulder, (2) a

21

bruise under the left eye, (3) an abrasion to the left knee, (4) a 2 cm laceration on the top front of the head and (5) a 1 cm laceration on the top right of the head. (*Id*.). Photos taken at the time of this body chart reveal the same. (Doc. 58-1, PageID.577-81).

Defendants collectively assert the amount of force used was minimal, justified, proportional to the need and no more than necessary to subdue Harrell. (Docs. 54, 57, 57-4, 57-3, 58, 58-2, 58-3). Moreover, COs House, Hudson, Price and Siler each state that no CO used any weapons on Harrell in seeking to enforce compliance and restrain him. (Docs. 57-3, 57-4, 58-2, 58-3). And if even if they had, the use of non-lethal weapons in a penological setting when there is a justified need is generally not considered "repugnant to the conscience of mankind." *See Conrad v. Dunn*, 2020 U.S. Dist. LEXIS 22291, *23-26 (S.D. Ala. 2020) (collecting cases to describe actions not objectively harmful enough to rise to the level of a constitutional violation).

Again, apart from generalized and unsworn conclusory denials, Harrell has not refuted Defendants' sworn statements. Moreover, and as further explained in the next subsection, Harrell's injuries were *de minimis*. Accordingly, this factor also favors Defendants.

## C. The Extent of Injury Sustained

Third, as to the extent of any injury sustained, Harrell's injuries from this incident were minimal. Nurse Long's 11:40 p.m. body chart reveals only minor scratches and bruises, and the record does not indicate any follow up treatment or care was needed to manage these injuries. (Doc. 58-1, PageID.573). As such, and

because the Supreme Court has held that *de minimis* uses of force are necessarily excluded from constitutional recognition, *accord. Hudson*, 503 U.S. at 9-10, this factor also favors Defendants. *See id*. (citing *Johnson v. Glick*, 481 F.2d 1028, 1033) (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of judge's chambers, violates a prisoner's constitutional rights.").

### D. Threat(s) Posed to Staff and Other Inmates

Fourth, the extent of threat(s) posed to staff and/or other inmates as perceived by a reasonable officer on the scene. This factor weighs overwhelming in favor of Defendants based upon the events leading up to the incident in the crisis cell.

According to the undisputed video evidence, the incident in the crisis cell occurred at approximately 10:09 p.m. (Docs. 57-6, 58-4). The commotion in the HCU had occurred fewer than five minutes prior. (Docs. 57-5, 58-4). Additionally, Defendants assert Harrell made various threatening comments to them both in the HCU and on the way to the crisis cell. For example:

- CO Price: "Harrell stated numerous times that he was not going to cooperate or give up his property (*i.e.*, his clothes) to us in the safe cell," and "stated several times that he was going to 'make us do our job...'" (Doc. 58-2, PageID.584).

- CO Siler: "Harrell was being defiant ... and stated that he was not going to 'give up' his clothes," and "Harrell said something to this effect: 'I'm not coming off with my clothes, so y'all are going to have to "come on" with it.'" (Doc. 58-3, PageID.590).

23

- CO Hudson: "… due to Inmate Harrell making threatening comments, saying he wasn't going to give up his clothes, and he was going to 'make us do our jobs…'" (Doc. 57-4, PageID.540).

- CO House: "…Harrell became uncooperative, and belligerent–saying 'y'all gone have to do y'all job.'" (Doc. 57-3, PageID.536).

In addition, the record reveals that Harrell has a substantial disciplinary history inside prison walls. (*See* Doc. 57-1, PageID.529-32). At least CO Price was aware of this history, stating that, "[p]rior to this night, Harrell had threatened that he wanted to have fights with correctional officers 'one on one,' and he had a reputation for being rebellious and violent." (Doc. 58-2, PageID.583-84). Further, Harrell had a substantial size advantage over at least some Defendants, (*see* Doc. 57-4, PageID.540; Doc. 58-3, PageID.589), and both COs House and Hudson attest to Harrell having admitted to them that he was under the influence of an unspecified drug at the time. (Doc. 57-3, PageID.536; Doc. 57-4, PageID.539).

In sum, the record paints a picture of a generally uncooperative inmate with a history of violence even before the events of December 21, 2019. When adding Harrell's size advantage, alleged admission to being under the influence of an unknown drug, a myriad of threatening comments made in a short period of time and a separate incident fewer than five minutes prior, any reasonable officer on the scene would have perceived Harrell as a potential threat. As such, this factor also favors Defendants.

### E. Efforts to Temper the Use of Force

All Defendants have asserted that no more force was used than necessary to subdue Harrell, and once he was subdued, no additional force was used. (Docs. 54, 57, 57-4, 57-3, 58, 58-2, 58-3). Neither Harrell's complaint, nor his unsworn opposition response and affidavit, call Defendants' assertion that they ceased using force upon Harrell's compliance into question. (*See generally*, Docs. 1, 10, 73, 74). Moreover, though the camera footage does not show the inside of the crisis cell, its timestamps reveal that the incident was over in less than two minutes. (Docs. 57-6, 58-4). Thus, this factor also weighs in Defendants' favor.

## V.   *Conclusion*

In sum, each of the five factors discussed above favor a finding that Defendants' use of force was "applied in a good-faith effort to maintain or restore discipline," rather than "maliciously and sadistically to cause harm." *Sconiers*, 946 F.3d at 1265 (citation omitted). Accordingly, Harrell has failed to establish the subjective prong as required pursuant to *Hudson*, and this is especially true when considering the "wide range of deference [given] to prison officials acting to preserve discipline and security." *Cockrell*, 510 F.3d at 1311 (citations omitted).

Moreover, Harrell's complaint does not satisfy the objective prong, which "focuses on whether the official's actions were 'harmful enough.'" *Sconiers*, 946 F.3d at 1265-66. *See id*. (citation omitted) ("Not every malevolent touch by a prison guard gives rise to a federal cause of action."). As previously discussed, the Supreme Court has held that "[t]he Eighth Amendment's prohibition of 'cruel and unusual

punishment' necessarily excludes from constitutional recognition *de minimis* uses of force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9-10 (citation omitted). As such, this prong is "contextual and responsive to 'contemporary standards of decency,'" *id.* at 9 (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)), and ultimately turns on whether the force used was in good faith, or maliciously and sadistically applied. In the present case, the record establishes Harrell's injuries were *de minimis*, and apart from Plaintiff's own allegation that Defendants "knew that they [were] acting in total disregards to the law," (Docs. 1, 10), the record does not support anything other than a finding that Defendants' use of force was legitimate and in a good faith effort to subdue an unruly and uncooperative inmate.

As a result of Harrell's failure to establish either of the *Hudson* prongs, it is clear that Defendants' use of force does not rise to the level of an Eighth Amendment violation. Moreover, there are no genuine disputes of material fact present, and no reasonable jury could find in favor of Plaintiff. Accordingly, Harrell's claim must fail as a matter of law. Further, because Harrell's complaint cannot survive summary judgment on this basis alone, qualified immunity need not be discussed.

In sum, and for the reasons set forth herein, the undersigned **RECOMMENDS** the motions for summary judgment be **GRANTED**.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within 14 days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b);

S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 30th day of January 2023.

*/s/ Katherine P. Nelson*
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**

27